Peelle, Ch. J.,
delivered the opinion of the court:
This is a claim for extra or additional compensation for carrying the mails to and from the post-office and the Union Station at Omaha, Nebr., and for profits prevented by the cancellation of the mail contract between the Government and the claimant.
The advertisement for proposals recited, among other things, that proposals would be received for carrying the mails in the screen wagons prescribed by the department on the routes specified as “ screen-wagon, mail-messenger, transfer, and mail-station service ” in the city of Omaha, Nebr., ■being route No. 457005, “ between the post-offices and railroad stations,” steamboat landings, mail stations, electric and cable cars, etc., for the term from July 1, 1902, to June 30, 1906.
*31 With said advertisement was a schedule showing, among other things, the service as it had been performed for the month ending July 27, 1901, namely:
“ Union Station:
“Illinois Central It. B. Co. (143077.).
“Union Pacific B. B. Co. (157001).
“ Chicago, Bock Island and Pacific Bwy. Co. (157064).
“Missouri Pacific Bwy. Co. (157075).”
As the postal routes on the Chicago and Northwestern Bailroad, the Chicago, Milwaukee and St. Paul Bailroad, and the Wabash Bailroad, Nos. 135003, 143028, and 145061, respectively, all terminate at Union Pacific Transfer, Iowa (Council Bluffs), from which point their mail was carried into the Union Station on the tracks of the Union Pacific Bailroad Company (route 157001), the department, it appears, deemed it unnecessary to specify those roads in the schedule, and particularly as the mail trains of those roads were operated from Council Bluffs, Iowa, to the Union Station, Omaha, as Union Pacific trains and the Union Pacific Bailroad Company was paid therefor.
But the claimant contends that when he made his proposal he was not aware that he would be required to carry the mails from these three roads or from any road except those specifically mentioned in the schedule submitted with the advertisement.
. Unfortunately for this contention, however, there Avas submitted with the advertisement “ Instructions to Bidders,” Avhich, among other things, recited that the schedule submitted showed “ approximately the service as performed during the week named,” and for that reason bidders were admonished to “ personally inform themselves of the amount and character of the service that Avill be required during the contract term, beginning Avith July 1, 1902.”
Furthermore, bidders and their sureties were “ warned that they should familiarize themseUes with the terms of the contract, schedules of service, and instructions-contained herein before they shall assume any liabilities as such bidders or sureties, to prevent misapprehension or cause of complaint thereafter,”
*32 As an additional precaution bidders were required in making their bids to use the forms prepared by the department, which the claimant did, reciting, among other things, that “ this proposal is made after due inquiry into and with full knowledge of all particulars in reference to the service, .and also after careful examination of the conditions attached to said advertisement, and with intent to be governed thereby.”
It will thus be noted that the service for which bids were advertised was only shown by the schedules approximately, and bidders were cautioned to personally inform themselves both of the amount and character of the service to be required, and then to certify that the proposal made by them was after due inquiry and with a full knowledge of all the particulars in reference to the service. This the claimant says he did, as shown in Finding III.
The advertisement cast upon the claimant the duty and responsibility, before he made his bid, of ascertaining for himself “ the amount and character of the service that will be required during the contract term,” and if he made due inquiry, as he says he did, before submitting his proposal he was undoubtedly advised of the amount and character of the service that would be required of him, which was to include all the mails entering the Union Station; hence whether we consider the claimant’s efforts to ascertain the particulars in reference to the service as insufficient or whether we consider him as having neglected to make due inquiry, we must consider him as having obtained the information he might by proper diligence have ascertained, especially when he says his proposal was made “ after due inquiry into and with full knowledge of all the particulars in reference to the service.”
There was no guarantee by the Government as to the amount of mail that the claimant would be required to carry other than all the mails entering the Union Station, and as to that he was admonished to make inquiry for himself.
The advertisement, made part of the contract, without doubt called for bids to carry all the mail from the Union Station in screen wagons prescribed by the department on the one route (457005) described as “ screen-wagon, mail-messenger, transfer, and mail-station service * * * be *33 tween the post-offices and railroad stations ” in the city of Omaha; and when the claimant said he proposed “ to carry the mails of the United States from July 1, 1902, to June 30, 1906, on above-numbered route ” he meant all the mail entering the railroad stations, and therefore all the mail carried into the Union Station on route No. 157001 on the tracks of the Union Pacific Railroad Company.
The contract which the claimant signed was in conformity with the advertisement, and was equally as explicit, and obligated the claimant to carry the whole of said mail, whatever may be its size, weight, or increase ” during the term prescribed in the advertisement. That is to say, the claimant obligated himself “ to take the mail from, and deliver it into, the post-office, railroad stations, mail stations, electric or cable cars, and cars at such points and at such hours, under the directions of the postmaster at said city, approved by the Postmaster-General, as will secure dispatches and connections and facilitate distribution, and at the contractor’s expense for tolls and ferriage.”
The claimant could not have understood from that language that he was dividing the responsibility of carrying the mails on that screen-wagon route 457005 with some one else to and from the railroad stations. He must have understood, as by the language of the contract he was bound to know, that he alone was to take the whole of said mail from and deliver it into the post-office and railroad stations in said city, including all the mail arriving on the route of the Union Pacific Railroad.
The contract may have proved an unfortunate one for the claimant; but as by the advertisement and instructions to bidders the way was open to him to ascertain, if he did not do so, all the facts essential to enable him to know the amount and character of the service to be performed, his failure can not be charged to the Government, nor to its officers, especially since by the instructions to bidders he was informed that the schedule showed only the approximate service to be performed.
The service required of the claimant by the Postmaster-General, of taking the mail from the Chicago and Northwestern, the Chicago, Milwaukee and St. Paul, and Wabash *34 railroad companies, entering the Union Station on the tracks of the Union Pacific Bailroad Company, as aforesaid, can not be considered either as new extra or additional service, within the meaning of these terms as adjudicated by this court (Utah, Nevada and California Stage Co. v. The United States, 39 C. Cls., 435; Profit v. United States, 42 ibid., 248), and must, therefore, be held to be part of the service contemplated and covered by the terms of the contract; and the claimant is not, therefore, entitled to recover for said service.
On May 20,1903, the Postmaster-General annulled the contract because, as set forth in Findings VIII and IX, the claimant failed and refused to comply with the same. In this respect paragraph 31 of the instructions to bidders provided that “ the Postmaster-General may annul a contract for repeated failure; for violating the postal laws; for disobeying the instructions of the Post-Office Department,” etc. They also specified the kind and number of horses and wagons, and how they should be kept, all of which, including the service, were to be subject to the approval and control of the postmaster; and the property was to be subject to frequent inspection to ascertain its condition; and the failure or refusal of the claimant to keep his horses, wagons, and harness in good order and appearance, or to obey the instructions of the Postmaster-General, was sufficient cause for the annulment of the contract. The tenth paragraph of the contract is to the same effect.
The authority given to the Postmaster-General over the mails is sufficiently broad and comprehensive to enable him to annul a contract whenever a contractor refuses to perform according to his contract and the regulations of the Post-Office Department or whenever, in his judgment — unclouded by fraud or gross error — the public interests demand it. He may discontinue the entire service under the contract upon the payment of one month’s extra pay (Slavens v. United States, 38 C. Cls. R., 574, affirmed by the Supreme Court, 196 U. S., 229, and other authorities which might be cited.) But in the present case the contract was annulled because of the repeated failure of the contractor to comply with his contract arid the regulations of the department, as set forth in Finding VIII, and, therefore, the question of one month’s extra pay does not arise.
*35 There is no contention that the Postmaster-General grossly abused the discretion lodged in him to annul the contract. The facts upon which he based his action were ascertained by the officers of the Government in the usual way; and there is nothing in this case which would justify the court in holding that he abused his discretion, even if the court felt at liberty to go behind the facts upon which he based his action.
The failure of the claimant to comply with the contract and the instructions of the Postmaster-General as herein set forth was not only sufficient ground to authorize the Postmaster-General to annul the same (sec. 1292, Postal Laws and Regulations, under act Aug. 3, 1882, 22 Stat. L., 216), but Avas sufficient authority for the Postmaster-General to withhold payment to the claimant for service performed and to relet the contract or service to another at the claimant’s expense, which was done, and therefore he is not entitled to recover on this branch of the case.
The claimant entered into the contract after due inquiry as to the amount and character of the service to be performed, as he was admonished and warned to do before making his bid, thereby obligating himself to the performancé of the service so contracted to be performed under the direction of the Postmaster-General and the regulations of the Post-Office Department, and he must therefore be held to the contract he made and to the performance of the service thereunder, as was doubtless understood and contemplated by the parties at the time of the execution of the contract.
The petition is dismissed.